Good morning. Thank you, Your Honor. May it please the Court, James Moore on behalf of the State of South Dakota. This case involves the State's efforts to regulate its initiative and referendum process. As the Court knows from the previous decision in South Dakota Voice v. Noem, the current legislation, SB 180, follows a previous bill, House Bill 1094, that was substantially broader in scope than the legislation that's currently at issue. The legislation under review today was, in fact, narrowed in response to constitutional deficiencies found by Judge Kornman, and this legislation was then challenged on similar grounds, and the District Court entered a preliminary injunction in joining all of SB 180 based on a facial challenge to the bill. Given the preliminary injunction context, the analytical framework involves the injunction factors. I'm going to start with likelihood of success on the merits, talk about the applicable standard of review and the burdens and the interests at issue in this case, and I'll try to get through all of that and answer whatever questions the Court has about any of the other issues in the case. With respect to the standard of review that applies in this case, obviously the Court's challenge is drawing the line between reasonable regulation of State elections and unconstitutional burdens on First Amendment speech. There's been a lot written about the applicable standard. There's less certainty, I think, in agreement on what standard applies in what context under the First Amendment. My sense from reviewing the Supreme Court cases since Buckley and this Court's cases is that a sliding standard of review based on the Anderson verdict framework is the applicable standard for most of SB 180 in this case, and I think the predominant reason that's the case is because of the electoral context of the case and the fact that the State is regulating its initiative and referendum process, which is a State-created right, not a Federal constitutional right. And while petition circulators based on Buckley have argued that the ballot committee has no protected First Amendment interest to engage in the initiative process because the right rises only under State law, that's on page 14 of your brief, how do you square that with Meyer v. Grant? Meyer v. Grant said that there is — I think it's hard, Your Honor, to distinguish between the First Amendment right and the State-created process. I think petition circulators clearly have a right. I think in Meyer v. Grant there was an extremely broad effort with respect to the legislation that was at issue there that prohibited all paid circulators, and so I think that the cases since Meyer v. Grant have been more deferential to the State and have, in fact, emphasized that when there is a State-created process, that the State's interests are due more deference. So the question that you asked, to some extent, goes to the standing issue. I think the standing issue morphs into the burden analysis. I think it morphs into the irreparable harm analysis. Is that really — you know, I'm just thinking through. I'm trying to analogize this to other areas of First Amendment activity, and in particular, the judicial election line of cases, right? I realize we don't have a judicial election issue here, but that is unique, as unique as can be, to State law. And you have the White case. You have all these cases saying the First Amendment interest is exactly the same, even though this is a creature of State law. And in those cases, it actually applies strict scrutiny. So I guess I don't understand why it matters. If it's an election, if it's a referendum, I don't know why it matters for First Amendment purposes, the State — why it's a unique State procedure. And my argument isn't that there's no First Amendment interest here. I think that's clear based on Buckley. My argument is based on the decisions that say the State's interest — the State is entitled to regulate its initiative and referendum processes, and in that regulation and in reviewing that regulation, the State is entitled to considerable deference, to substantial latitude, to some leeway. And so I think that unless that language is just puffery and doesn't have any meaning, it has to — it has to have some effect on the standard of review. And I think the two most applicable cases from this Court for the context of this case are the Miller v. Thurston decision and the Institute referendum v. Yeager case, in which — Is the argument here that there's no — that exacting scrutiny, then, is not the standard of review? Is that the argument you're trying to make? It depends on what exacting scrutiny means. And I — if — if exacting scrutiny means what the Supreme Court said exacting scrutiny is and the American Foundation's — American's Prosperity Foundation case v. Bonta, then, no, I don't think that standard applies. That standard requires narrow tailoring and a compelling governmental interest. Well, let me ask you this. How do you square that, then, with Calzone, our recent en banc decision? That was a unique State. There are a lot of unique State procedures set up there. And we said it's a disclosure law, therefore, it's exacting scrutiny. And we even suggested at one point, although the Supreme Court, I think, has scaled back on that, that there could even be strict scrutiny in those circumstances. Although in Calzone, the — the standard that the Court applied, although exacting scrutiny, referred to a substantial relation to a sufficiently important governmental interest, which is different than the recitation of the standard in the Bonta decision. And I think you have to square Calzone with Miller v. Thurston. And I think Miller v. Thurston is closer to the facts of this case. And in Miller v. Thurston, it was sufficient that the legislation advanced an important interest. So I don't think the label controls, and I think that you have to get away from the label and look at the context and the facts. And — Don't we have to take Bonta into consideration? Well, to some extent, yes. I think it's a hard case to take into consideration because there was a lot of uncertainty at the Supreme Court. There was — there were three justices who agreed on the standard of review in that case. So it's hard to — it's hard to come away from that decision saying it's clear that this is a standard that applies. And I think you have to, again, distinguish the context, which is different. When we're talking about the initiative and referendum process, there's a lot of language, and you can go back to the Doe v. Reed case from 2011, in which the Supreme Court talked about the importance of the state's interests in not only regulating that process, but in recognizing that it is an inherently public process and that the public has a role to play in basically ensuring that there's not only no fraud in the process, but no mistakes made in that process. So I think when you look at the burdens in this case and when you look at the state's interests, one of the important things to keep in mind is that they are subject to a different standard. With respect to burdens, the courts have said that a generalized fear isn't enough, that bare assertions aren't enough, that you need facts, establishing that the legislation actually burdens the circulator's First Amendment right. With respect to the state's interests, however, the state is allowed more leeway than that. And the Miller v. Thurston decision, in fact, says that the state doesn't need empirical justification for legislation. We, in fact, have empirical justification in this case based on the decision in Johnson v. Krebs, the lawsuit that was litigated in which Judge Devaney entered a writ of mandamus prohibiting an initiated measure from being on the ballot after the initiated measure had been certified to be on the ballot after the Secretary of State completed the review process that was going on there. And I think it's important to note that the Secretary of State's review process invalidated 200 signatures, and through the litigation process, there were another 116 signatures that were invalidated. That bill, and there's testimony in the record in the form of affidavits, that bill was the genesis, I'm sorry, that lawsuit was the genesis for both HB 1094 and for HB 180. The State acted on what it saw was a problem with particularly paid petition circulators. But not solely with paid circulators, right? Not solely, but predominantly is the adverb that's in the affidavit. Was that the 2018 petition that you talked about as far as the statistical analysis? I believe it was. Yes, I think it's 2018. It preceded both bills. I had a question about that. Your brief asserts on page 27 that you've presented evidence of corruption and compromised election integrity, and that 45 percent of sample signatures on this petition were declared invalid. And my question is, does that really show evidence of corruption or just clerical errors? I think that's a fair point, Your Honor, and I'm not prepared to stand here today and say that the State's primary influence was fraud or corruption. But I think that goes to our, regardless of what standard of review we apply, we have to know what the State's interest is. And if the State is asserting an interest in preventing fraud and corruption, you've already got a wide array of statutes already in place to address that. So at what point does it become cumulative, and how does that affect our analysis? Well, I think the reason that the Johnson v. Krebs litigation is significant, Your Honor, is because it highlighted the fact that existing procedures were not sufficient to prevent the problems that occurred in that case. Clerical problems or fraud? In that case, Your Honor, I think it's fair to read Judge Devaney's decision as related to clerical problems. But again, Dover v. Reed says preventing mistakes is a legitimate interest. The State clearly has an interest in doing that. So I don't There's no question that it's a legitimate interest, but it has to be substantially related or narrowly tailored to meet that interest. And if you've already got a whole array of statutes in place and you just keep adding more, that affects our analysis. But I think the evidence in the case is that the existing statutes were ineffective, Your Honor. I don't know. I don't know how you get past that. What evidence? Again, the fact that initiated Measure 26, based on the Secretary of State's review, would have been on the ballot. But for the litigation and the Court's review of Mandamus, it would have been on the ballot. So existing procedures in that context were not sufficient, and the Secretary of State did not catch all of the mistakes. Maybe I'm missing something, but are you telling me the evidence of fraud and corruption or evidence of errors in the petition? Evidence of errors such that the signatures were invalidated for whatever reason. That's not fraud. No. I agree, Your Honor. The affidavit that's in evidence and the writ from Judge Devaney doesn't show fraud. It shows invalid signatures. So what does all this have to do with — I mean, if that's true, if we're talking about mistakes, what does all this have to do with paid circulators? You admitted that it wasn't solely paid circulators. So I wonder whether, at the very least, this is substantially under-inclusive because we could have unpaid circulators, people who don't know what they're doing, don't get training, make as many mistakes as paid circulators. And the evidence in the case is that the problems that were encountered in the litigation were with — predominantly with paid circulators, and based on Judge Kornman's invalidation of the definition of petition circulator, which applied to all circulators, not just paid circulators, and which was determined to be unconstitutional, the legislature narrowed the scope of the bill. So I think it's an effort to narrow. Yeah. What about the — you know, and I think what undermines that to some extent is what the — what was stated about the reasons for the legislation, which is it was to keep liberal interests from out-of-state influencing local politics, right? And so it seems like the State's interests were less about reducing mistakes and more about targeting specifically paid circulators, which is almost an animus — it's not quite animus, but a — but a targeting of the paid circulators. Yeah. The Supreme Court has said that if there's a legitimate, nondiscriminatory reason for legislation, it doesn't matter that particular legislators may have had partisan interests or motives in voting for it. No, that's — that's fair, but that's mostly in rational basis review. As we know from cases like Masterpiece Cake Shop, that doesn't — that doesn't always apply in strict scrutiny, and maybe it's an open question on exacting scrutiny. I think there's clear evidence here, though, Your Honor, that there was a problem and that the legislature focused on paid circulators in response to the problem. I want to reserve at least 30 seconds, if that's all right. Mr. Moore, I'll give you three minutes for rebuttal. Thank you. All right. Mr. Leach, you may proceed when you're ready. Thank you, Your Honor. May it please the Court. Buckley v. American Constitutional Law Foundation established that petition circulation is core political speech for which First Amendment protection is at its zenith. For three reasons, the district court properly entered a preliminary injunction against SB 180. First, SB 180 requires every paid circulator, before beginning to circulate, to disclose to a public registry for publication in that public registry available to the entire world the circulator's name, home address, e-mail address, and telephone number, thereby surrendering all anonymity, privacy, and freedom from harassment. The State has no legitimate interest whatsoever in making all that information for paid circulators available to the general public at the beginning of the process. Counsel, what if they just limited that to their name and address? Would that serve a State interest? No, certainly not, because the address is leads, would let harassers go directly to the home. And that was that, you know, that's the initial problem. I did have another question about that as well. So as I understand the process, the verification of the petition signatures occurs at the end of the process. Yes. And yet this requires disclosure up front. Is there — does the State explain the interest in up-front disclosure? No, it doesn't. And, Your Honor, that's the enormous problem with that statute, with the statute. In South Dakota, their petition circulation can begin 24 months before an election. And the circulators, the signatures are due either 12 months if it's a constitutional amendment or six months before the election if it's an initiated measure. So all this information is required to be disclosed before circulation even can begin, whereas the State has no need for it whatsoever until the end of the process when it actually receives the signatures all at once and counts the signatures and evaluates the 700 statistically selected. So there's no connection whatsoever between the two. And with no connection, there's no State legitimate interest. And it cannot stand any scrutiny, let alone exacting scrutiny, as defined in Calzone to being a substantial relationship to a sufficiently important governmental interest. And I'm holding my hand so far apart just to represent the time period between beginning to collect signatures and the end when the State actually needs the information. And on that point, Your Honor, I'd like to give you one citation that's not in my brief but that I think is important enough that I want to mention it today. And that is South Dakota Administrative Rule 05-02-08-07, which says that at the time petitions are submitted, at the end of the process, the circulator whether paid or unpaid, must disclose, under oath and penalty of perjury, his or her name and home address. So the State already has that information per that regulation that it needs to consider these signatures. So that this is — Suppose, though, that — I just want to push you on that. Suppose that you change it from — I think you mentioned that rule, and I wasn't aware of it — that sets it at the end. Suppose now — sets it at the end. It sets it at the end when you submit the petition. My question is, suppose you have the same facts as Judge Graz suggested, except for now it's not publicly disclosed. It's retained by the Secretary of State or whoever runs the elections. And the idea would be we need to figure out if somebody complains about a paid circulator and their conduct or says that they're acting in an unlawful manner. Would that be constitutionally acceptable? No, Your Honor, because it's still a burden with no purpose. In your hypothetical, the possibility was that someone complained about a circulator. Well, people complain about other people, of course, every day, and there's a method for dealing with them, which is to call the police officer if there's some problem. I don't know what the other complaint would be. Well, somebody trying to coerce me to sign a petition, not in a physical or a criminal way, but harassing me to the point where, you know, I feel like I'm just trying to get them off my property or off — you know, leave me alone. I don't want to sign the petition. And so they complain to the Secretary of State's office about a paid or unpaid circulator. I guess that theoretically could happen, but it doesn't seem a very likely way to persuade someone to sign a petition by harassing them once they turn their back and exercise the right to walk away. I'm asking the question because I'm trying to figure out how far your rule goes, and I think I disagree with you. I think that if you ask them ahead of time, not only for their own benefit, but for the benefit of the public as a whole. Well, then you're raising the question, though, of the second problem with this statute, which is that the — if the circulator does not comply exactly with this and does not update every seven days, let's say it goes to the eighth day, then every signature submitted from honest voters is disqualified. And in Miller v. Thurston, this Court held that a signature on a petition is core political speech. And so the way this statute is written, even if that initial information is not disclosed to the public, all those votes are disqualified for no reason or possibly this theoretical possibility that some crazy circulator could try to persuade someone by getting in their face. Right. Yeah, you're right. I mean, I was addressing only the point of disclosure, but you're right that there's some other parts of this bill that also create burdens, whether they're unconstitutional burdens is what we have to decide, but they do create what all these people must disclose at the beginning and the penalty on honest voters. That is — the State has no interest in disqualifying the signature of an honest voter because the circulator failed, after obtaining it, to update within seven days, perhaps moving and perhaps completely inadvertently. You know, a college student goes back to school at the end of the school year and doesn't change address within eight days, or anyone moves or anyone changes their e-mail address. The State has no interest in disqualifying those voters' signatures, no legitimate interest, and certainly it cannot rise to the level of exacting scrutiny under Calzone with a substantial relationship to a sufficiently important government interest. So it's — maybe I've already made my point, but it's not just what the burden is and whether there's a minimal burden, but it's the effect on poor political speech of voters' signature from this rule the State has imposed. We've covered the first two grounds why this statute is unconstitutional. The third ground I'd like to turn to now is that it applies only to paid circulators. And in the district court we argued that under Citizens United, strict scrutiny applies, and there's no compelling State interest possible because this is a citizen initiative, and a citizen initiative cannot engage in quid pro quo corruption. The district court found it unnecessary to reach that issue because under exacting scrutiny, this law was unconstitutional on that third ground as well. Likewise, we're in the same position in this Court. We're asserting strict scrutiny, but you need not reach it. That question, whether strict scrutiny applies, because we are — because under exacting scrutiny goes out, because there is no substantial relationship to a significantly important governmental interest to focus and discriminate only against paid circulators, thereby discriminating against the use of money to enable political speech, which of course is the core holding of Citizens United. So the State has violated that rule of discriminating against money to enable political speech. And in doing so, it does not meet exacting scrutiny. It does not meet either strict scrutiny or exacting scrutiny. Mr. Leach, in your view, is there anything in the record that indicates a higher level of fraud or error on petitions circulated by paid circulators as opposed to volunteers? The only thing in the record, Your Honor, is this one affidavit from Representative Hansen. And Representative Hansen, as was discussed during my friend's argument, is a compromised witness because of what he said to the newspaper about the purpose of SB — of HB 1094, which is the immediate cut-and-paste predecessor of SB — of SB 180. But continuing, Your Honor, even putting that aside, in that situation, Representative Hansen testifies that in past 10 years he knows of one case where there's been a problem, and that's this 2018 case. In that case, the system worked, and the proposed initiative was disqualified. And the system worked through this two-part process that the State has set up as part of its arsenal of safeguards, the first part being the Secretary of State reviews. The Secretary of State finds 200 just go out on their face. And then it goes to the circuit court. That's the second part of the two-step process. And the circuit court has to disqualify. If it's going to disqualify 65 signatures, then the ballot, then the initiative goes out. Well, the circuit court on the face of these petitions disqualifies 106, 102 of them because they're not properly completed, and four of them because they're duplicates. And there's only 10 signatures left in question, which don't matter to anyone, in which no one knows the reason why. But is there any evidence about what percentage of those disqualified signatures were collected by paid people as opposed to volunteers? I simply don't recall. No, there isn't. And to add to that point, Your Honor, I mean, all the affidavits that I've seen in the past, I mean, I don't know.  I don't know. I don't know. I don't know. And just to add to that, Your Honor, as far as the issue of providing election integrity, that that allows them some leeway in regulating paid circulators, how would you respond to that? Well, I'd respond with two points, Your Honor. First of all, some leeway is a long ways from proving, satisfying, exacting scrutiny. But to go to the factual question, I mean, the district court in this case, and if I'm not mistaken, the Supreme Court in Buckley, said that paid circulators have an added incentive to be correct and accurate so that they can get, so they can keep their jobs and they can continue to be hired for that work, because no paid circulator is more dangerous than a petitioner who's ever going to be hired again. So with that, Your Honor, I see my time is almost up. I'd like to leave you with the words of Justice Thomas, concurring in McCutcheon v. FEC in 2014, in which he wrote that political speech is the primary object of self-government and is the lifeblood of self-governing people. Thankfully, we have decisions such as Citizens United, Calzone, and Bonta, which follow that principle. This, in this case, Judge Pearsall's decision correctly follows that principle. I see my time is up. I'll just finish my sentence, if I may, Your Honor. Thank you, Your Honor. Judge Pearsall's decision properly follows that principle, and to do anything other than to affirm would be to let a little of the lifeblood out of the First Amendment. Thus, we ask the Court to affirm the preliminary injunction and remand for consideration of the permanent injunction. Thank you, and thank you for allowing me to exceed my time, Your Honor. Thank you, Mr. Leach. All right. Mr. Moore, you may proceed with rebuttal. Thank you, Your Honor. To start at the end, again, the language and the standard matters in this case. There's a big difference between some leeway being afforded to the State and considerable leeway being afforded to the State, which is the language the Supreme Court has used. There's a considerable difference between requiring the State to prove statistically what percentage of problems are due to paid circulators and what percentage to fraud, and this Court's language in Miller v. Thurston has been that empirical justification and elaboration is not necessary in this particular context. Counsel, I want to ask you the question I asked opposing counsel, because I think it goes directly to narrow tailoring more than anything else, which is why disclose it to the public? You heard me ask a hypothetical to opposing counsel. I think you probably gave me, at least in my view, the wrong answer, which is I think that it would pass exacting scrutiny or be narrowly tailored if it was solely kept within the Secretary of State, but I see no reason to publicly disclose it other than to facilitate harassment or to make those paid circulators look bad. So to start at the end, if that's a problem with SB 180 at the end of the day, then it can be severed and it can be limited on that basis, the Court's injunction, rather than a facial invalidation of SB 180 altogether, which is what happened in this case. Secondly, I don't agree, Your Honor, based on the language, primarily the language from the Supreme Court's decision in Doe v. Reed where there's extensive conversation about the role the public plays in this inherently public process and the role that the public can play in basically trying to prevent and correct mistakes before the question of burden, which is what evidence is there in this case with respect to this legislation in South Dakota that that's a burden. The public registry is available by contacting the Secretary of State. The evidence in the case is that no one has ever contacted the Secretary of State to ask for that. Could you, but, you know, I'm going to stop you there, because couldn't you ensure accuracy, ensure no fraud by simply having the governmental entities themselves ask for this information up front? I just, I don't see what in the enforcement mechanism could possibly be furthered by public disclosure. Well, again, I think that you identified the argument yourself based on some of the language in Doe v. Reed. Secondly, I think at this point you're clearly applying a narrow tailoring requirement as part of the standard, which I'm not conceding applies in this case. I don't think that's part of the review process under the Anderson-Burdick sliding standard of review, and I think that's what applies here. In 10 seconds, I encourage you to go back and reread the Yeager decision from that Judge Haney wrote. I think it's very, very hard to square the result in that case and the Court's analysis from the decision the district court reached here. Thank you very much. All right. Thank you, Mr. Moore.